UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DTE Energy Trading, Inc., a Michigan corporation,

        *Plaintiff*,

        v.

Enbridge Gas Distribution Inc., a foreign corporation,

        *Defendant*.

Civil Action No. 10-12897

Hon.

## COMPLAINT

For its complaint, DTE Energy Trading, Inc. ("DTE Energy Trading") alleges as follows:

### NATURE OF THE ACTION

1.    This is an action brought by DTE Energy Trading against Enbridge Gas Distribution Inc. ("Enbridge") arising out of Enbridge's failure to act in good faith with respect to certain contracts it executed with DTE Energy Trading. DTE Energy Trading seeks damages caused by Enbridge's failure to perform its contractual obligations in good faith as well as equitable relief to restore to DTE Energy Trading the benefit of the bargain it originally made with Enbridge.

### JURISDICTION

2.    This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between the citizen of the State of Michigan and the citizen of a foreign state.

1

## VENUE

3. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

4. The plaintiff in this action is DTE Energy Trading, a marketer of wholesale power and gas products and services. DTE Energy Trading is headquartered in Ann Arbor, Michigan. DTE Energy Trading is a wholly-owned subsidiary of DTE Energy Company ("DTE Energy") one of the nation's largest diversified energy corporations.

5. The defendant in this action is Enbridge, a natural gas distribution company that is headquartered in North York, Ontario. Enbridge is a wholly-owned subsidiary of Enbridge Inc.

## FACTUAL BACKGROUND

### I. The Vector Pipeline

6. Vector Pipeline L.P. ("Vector US") is a limited partnership formed under the laws of the State of Delaware. Vector Pipeline Limited Partnership ("Vector Canada" and collectively with Vector US, "Vector") is a limited partnership formed under the laws of the Province of Alberta, Canada.

7. Vector owns and operates a natural gas transmission system (the "Vector Pipeline") that extends from interconnections with various interstate pipelines at or near Joliet, Illinois and traverses through Illinois, Indiana, and Michigan to an interconnection at the United States-Canadian border and then continues to Ontario, Canada.

8. The portion of the Vector Pipeline located in the United States is owned by Vector US, while the portion of the Vector Pipeline located in Canada is owned by Vector Canada. Vector is jointly owned by subsidiaries of DTE Energy Company and Enbridge, Inc.

## II.     The Agreement Between DTE Energy Trading And Vector

9.     In early 2000, DTE Energy Trading entered into a transaction with Vector for firm natural gas transportation service on the Vector Pipeline. Specifically, DTE Energy Trading and Vector contracted for service on a single path originating at an interconnection with Alliance Pipeline L.P. ("Alliance") near Chicago, Illinois and terminating at an interconnection with Union Gas ("Union") near Dawn, Ontario (the "Chicago-Dawn Path").

10.     Because the Chicago-Dawn Path crosses the international border between the United States and Canada, the transaction is memorialized in a pair of service contracts: one between DTE Energy Trading and Vector US and the other between DTE Energy Trading and Vector Canada.

11.     The first service contract, dated April 25, 2000, provides for the transportation of 200,000 Dekatherms ("Dth") of gas per day from the Alliance interconnection point to the international border ("DTE-Vector U.S. Contract"), also known as the Chicago to St. Claire leg.

12.     The second service contract, dated January 19, 2000, provides for the transportation of 211,011 Gigajoules ("GJ") of gas per day from the international border to the Union interconnection point ("DTE-Vector Canada Contract"), also known as the St. Claire to Dawn leg.

13.     The rates and terms of service under the DTE-Vector U.S. Contract are regulated by the U.S. Federal Energy Regulatory Commission ("FERC") and are subject to the terms of Vector US's FERC Gas Tariff.

14.     The rates and terms of service under the DTE-Vector Canada Contract are regulated by the Canadian National Energy Board ("NEB") and are subject to the terms of Vector Canada's tariff approved by the NEB.

3

15. The transaction for the Chicago-Dawn Path is papered as two service contracts consistent with Vector US's and Vector Canada's ownership of the Vector Pipeline, and in order to give proper effect to the different regulatory regimes that govern the terms of service of the Chicago to St. Claire leg of the path and the St. Claire to Dawn leg of the path.

16. There is no gas trading hub at the St. Claire border crossing point. Moreover, the St. Claire border crossing point is not an independent primary receipt or delivery point available to shippers. Thus, shippers cannot, and would have no reason to, contract for transportation capacity on just one or the other portion of the path, terminating their transaction at the border crossing; they must utilize the entire path.

### III. The Agreement to Release Capacity To Enbridge

17. In 2008, DTE Energy Trading agreed to transfer, or "release," a portion of its firm capacity in the Chicago-Dawn Path to Enbridge.

18. DTE Energy Trading did so in two tranches of 50,000 Dth/day each.

19. Because the regulatory requirements for releasing gas pipeline capacity differ between the United States and Canada, DTE Energy Trading and Enbridge entered into four agreements to effectuate the release of these two tranches of capacity — two agreements with respect to the United States portion of the Vector Pipeline (Chicago to St. Claire leg) and two other agreements with respect to the Canadian portion of the Vector Pipeline (St. Claire to Dawn leg).

20. With respect to the two tranches of capacity in the United States portion of the path, DTE Energy Trading posted two point-to-point, prearranged capacity release offers in Vector's electronic bulletin board system, QuickNom, consistent with the regulatory requirements of FERC.

21. Pursuant to the procedures established in Section 29 of Vector US's FERC Gas Tariff, after posting the offer for competitive bidding, Vector awarded both tranches of capacity to Enbridge.

22. With respect to the two tranches of capacity in the Canadian portion of the path, DTE Energy Trading entered into two assignment agreements with Enbridge, consistent with the regulatory requirements of the NEB.

23. Vector awarded the first tranche of released U.S. capacity ("First Tranche") to Enbridge on February 25, 2008, for a release term commencing on November 1, 2010 and ending on October 31, 2013 ("First U.S. Release").

24. DTE Energy Trading entered into an assignment agreement with Enbridge for assignment of the first tranche of Canadian capacity on March 5, 2008, also for a term commencing on November 1, 2010 and ending on October 31, 2013 ("First TAA").

25. Likewise, Vector awarded the second tranche of released U.S. capacity ("Second Tranche") to Enbridge on August 22, 2008, for a release term commencing November 1, 2010 and ending on October 31, 2015 ("Second U.S. Release").

26. DTE Energy Trading entered into an assignment agreement with Enbridge for assignment of the second tranche of Canadian capacity on August 28, 2008, also for a term commencing on November 1, 2010 and ending on October 31, 2015 ("Second TAA").

27. The short delay in executing the First TAA and Second TAA after Vector awarded the releases of the U.S. capacity to Enbridge was caused by the fact that, pursuant to the provisions of Section 29 of its FERC Gas Tariff, Vector was required to post DTE Energy Trading's release offer for competitive bidding prior to awarding the capacity release to

5

Enbridge. The parties executed the First TAA and Second TAA only after they were certain that Enbridge had been awarded the releases of the U.S. capacity in the path.

28. DTE Energy Trading and Enbridge agreed to release the capacity in the Chicago-Dawn Path at a rate of US$0.2688/Dth for the First Tranche and US$0.310/Dth for the Second Tranche.

29. At the time of the First U.S. Release and the Second U.S. Release, the maximum Vector demand rate permitted under Vector's FERC Gas Tariff for the U.S. capacity was US$0.327/Dth.

30. In order to avoid currency exchange rate exposure, and consistent with its ordinary business practice, Vector allocated all of the rate for the First Tranche to the First U.S. Release and all of the rate for the Second Tranche to the Second U.S. Release, even though part of both the First Tranche and Second Tranche were in Canada.

31. These allocations were consistent with the maximum tariff rate permitted by FERC, and nothing in FERC's policies or regulations prohibits parties from allocating the rates in this manner.

32. Both the First U.S. Release and the Second U.S. Release state that Enbridge "will receive corresponding Vector-Canada capacity from St. Clair (international border) to Dawn at no additional cost."

33. Consistent with this understanding, the First TAA and Second TAA both reflect a toll of zero Canadian dollars.

34. On February 27, 2009, Vector filed with FERC a proposed general system-wide rate decrease pursuant to Section 4 of the Natural Gas Act ("NGA").

35. On December 28, 2009, FERC approved a settlement regarding Vector's filing that resulted in a reduced maximum tariff rate of US$0.255/Dth for firm transportation service in the United States effective January 1, 2010.

36. FERC's regulations impose a price ceiling, equal to the pipeline's applicable maximum tariff rate, on rates for releases of capacity of more than a year.

37. Thus, by operation of FERC's regulations, the rates charged under the First US Release and the Second US Release must be reduced to no more than US$0.255/Dth, below the release rates agreed upon between DTE Energy Trading and Enbridge for the Chicago–Dawn Path.

**IV. DTE Energy Trading's Administrative Re-Allocation of Rates Consistent with the Parties Agreements**

38. To address the situation created by FERC's reduction of the maximum tariff rate, DTE Energy Trading has attempted to administratively re-allocate some of the rates charged under the First US Release and the Second US Release (to the Chicago to St. Clair leg) over to the St. Clair to Dawn leg.

39. The re-allocations permit DTE Energy Trading to comply with FERC and NEB regulations, and maintain the total cost of the transaction Enbridge and DTE Energy Trading originally agreed to undertake.

40. Enbridge has wrongfully reneged on its obligation to comply with the re-allocations and has refused to pay DTE Energy Trading the rates Enbridge agreed to pay under the First U.S. Release, Second U.S. Release, First TAA, and Second TAA (collectively, the "Agreements"), and stated that it will refuse to pay the rates in the future as monies become due and payable.

7

41. In refusing to pay the rates it contracted to pay, Enbridge has asserted the illegitimate justification that FERC does not allow DTE Energy Trading to re-allocate the rates.

42. There is nothing in FERC's policies or regulations, however, that prohibits the re-allocations to comply with the maximum tariff rate.

43. In fact, following FERC's reduction of the maximum tariff rate, similar re-allocations with other customers like Enbridge have routinely been effectuated, and FERC has not objected.

44. These re-allocations are consistent with the Agreements.

## COUNT ONE

### (Breach Of Contract)

45. DTE Energy Trading incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

46. The Agreements set forth the contract between the parties.

47. As set forth above, Enbridge has breached the Agreements by refusing to pay the rates it is contractually obligated to pay to DTE Energy Trading, and by repudiating the re-allocations in accordance with the intent of the parties to the Agreements.

48. Moreover, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement of the contract.

49. A party to a contract fails to act in good faith concerning the performance of that contract if the party evades the agreement.

50. The Agreements between DTE Energy Trading and Enbridge were the release of capacity in the Chicago-Dawn Path at a rate of US$0.2688/Dth for the First Tranche and US$0.310/Dth for the Second Tranche.

51. By refusing to pay the release rates as set forth in the Agreements, Enbridge has also breached its duty to perform its contractual obligations with DTE Energy Trading in good faith.

52. DTE Energy Trading has been and will continue to be damaged in an amount greater than $75,000 as a result of Enbridge breaches of the Agreements.

## COUNT TWO

### (Anticipatory Breach Of Contract)

53. DTE Energy Trading incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

54. DTE Energy Trading and Enbridge are parties to the Agreements.

55. Before Enbridge is required to make certain payments at the rates set forth above to DTE Energy Trading under the Agreements, Enbridge unequivocally declared its intent to repudiate the Agreements and to not perform its obligations to make the payments under the Agreements when the time for performance arrives.

56. Enbridge has committed anticipatory breaches of the Agreements.

57. DTE Energy Trading will be damaged in an amount greater than $75,000 as a result of Enbridge anticipatory breaches of the Agreements.

## COUNT THREE

### (Declaratory Judgment)

58. DTE Energy Trading incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

59. Under 28 U.S.C. § 2201, the Court has the authority to declare the rights of the parties where actual controversies exist within the Court's jurisdiction.

60. There are actual controversies between the parties as to whether Enbridge is required to pay the rates set forth in the Agreements, whether Enbridge is allowed to repudiate the re-allocations made in accordance with the intent of the parties to the Agreements, and whether Enbridge may refuse to pay the rates it is contractually obligated to pay to DTE Energy Trading.

61. DTE Energy Trading requests that the Court declare the rights of the parties with respect to the controversies set forth above.

## COUNT FOUR

### (EQUITABLE REFORMATION)

62. DTE Energy Trading incorporates by reference paragraphs 1 through 61 as though fully set forth herein.

63. The Court has the equitable power to reform a contract based on evidence that the contract, as drafted, did not conform to the agreement actually made.

64. DTE Energy Trading and Enbridge entered into the Agreements which set forth the rates Enbridge would pay to DTE Energy Trading, and there was no provision for the rates to be reduced.

65. At the time that DTE Energy Trading and Enbridge entered into the Agreements, the maximum Vector demand rate permitted under Vector's FERC Gas Tariff for the U.S. capacity was US$0.327/Dth.

66. Neither DTE Energy Trading nor Enbridge anticipated or expected any change to this maximum demand rate, let alone a reduction below the rates set forth in the Agreements.

67. The decision by FERC to approve the reduction in Vector's maximum tariff rate of US$0.255/Dth for firm transportation service in the United States effective January 1, 2010 fundamentally altered the bargain reached between DTE Energy Trading and Enbridge.

68. Therefore, in the alternative, if the Court finds that DTE Energy Trading does not prevail in its claims under the Agreements as set forth above, the Court should reform the Agreements pursuant to the doctrine of mutual mistake and/or other equitable doctrines so that DTE Energy Trading receives the benefit of the bargain it reached with Enbridge and to conform to the agreement actually made.

## DEMAND FOR RELIEF

WHEREFORE, DTE Energy Trading respectfully prays for an order of this Court:

(a) entering judgment in favor of DTE Energy Trading;

(b) awarding damages to DTE Energy Trading arising out of Enbridge's breach and/or anticipatory breach of its contractual duties, in an amount to be determined at trial;

(c) declaring that Enbridge is required to pay the rates set forth in the Agreements, that the re-allocations are contractually required and in accordance with the intent of the parties when they entered into the Agreement, and that Enbridge may not exploit FERC's reduction in rates to avoid paying the rates it is contractually obligated to pay to DTE Energy Trading, i.e. US$0.2688/Dth for the First Tranche and US$0.310/Dth for the Second Tranche;

(d) in the alternative, equitably reforming the Agreements so that DTE Energy Trading receives the benefit of the bargain it reached with Enbridge at trial and/or upon motion;

(e) assessing against Enbridge reasonable attorneys' fees and other litigation costs reasonably incurred by DTE Energy Trading in prosecuting this case; and

(f) issuing such further relief as the Court deems just and proper.

Dated: July 23, 2010

Respectfully submitted,

Honigman Miller Schwartz and Cohn LLP

*Attorneys for DTE Energy Trading, Inc.*

By: /s/ Andrew J. Lievense
 Andrew S. Doctoroff (P44344)
Andrew J. Lievense (P68925)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7000

DETROIT.4279252.4